# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

|  |  |
|---|---|
| SYLVIA DENISE JAMES, | CASE NO. 1:25-CV-0468 |
| Plaintiff, |  |
| vs. | CHIEF JUDGE SARA LIOI |
|  | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, |  |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Sylvia Denise James ("Plaintiff" or "Ms. James") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **VACATED** and **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Order.  On remand, the ALJ should: consider the entire record; accurately discuss the evidence; clearly articulate the rationale for her Step Two and Four findings with regard to Plaintiff's mental impairments; and ensure that her stated rationale builds an accurate and logical bridge between the evidence and the result.

1

## I.    Procedural History

Ms. James filed her DIB application on May 12, 2022, alleging disability beginning June 30, 2021.  (Tr. 17, 154, 178.)  She alleged disability due to depression, severe anxiety, and neuropathy.  (*Id.*)  Her application was denied at the initial level (Tr. 75) and upon reconsideration (Tr. 81).  She then requested a hearing.  (Tr. 84.)

On April 1, 2024, a telephonic hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 31-50.)  The ALJ issued an unfavorable decision on April 25, 2024, finding Ms. James had not been under a disability from June 30, 2021, through the date of the decision.  (Tr. 17-26.)  Plaintiff requested review of the decision by the Appeals Council.  (Tr. 151.)  The Appeals Council denied her request for review on January 29, 2025, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)  Plaintiff filed the pending appeal on March 7, 2025 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 9, 11, 15).

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Plaintiff was born in 1961, and was 60 years old on the alleged onset date. (Tr. 154.)  She completed the twelfth grade.  (Tr. 179.)  She previously worked as a financial services representative, billing typist, collection clerk, credit clerk, policy holder information clerk, and insurance sales agent.  (Tr. 35-40, 47-48.)

### B.    Medical Evidence

While the ALJ found Ms. James had severe and non-severe physical impairments (Tr. 19-20), Ms. James only challenges the ALJ's findings regarding her non-severe mental impairments (ECF Docs. 9, 15).  The medical records summarized herein are therefore limited to the evidence pertaining to Ms. James's mental impairments.  Further, because the ALJ's findings relate to the

2

time between Ms. James's June 30, 2021 alleged onset date and December 31, 2022 date last insured (Tr. 19), any discussion of records dated after 2022 is appropriately limited.

### 1.    Relevant Treatment History

On December 27, 2021, Ms. James called the Military Sexual Trauma ("MST") phone line and requested a referral for mental health services. (Tr. 719.)  She explained that her therapist, Kim Jordan, had recommended MST treatment.  (*Id*.)  She requested an appointment with a female provider, and was scheduled for an intake assessment on January 12, 2026.  (*Id*.)

On January 12, 2022, Ms. James attended an individual intake assessment with Ashley Fedynich, a clinical psychologist at the Cleveland VAMC.  (Tr. 714-19.)  She reported joining the Air Force in December 1980 and receiving an Honorable discharge in 1986.  (Tr. 714.)  In 1982, during her military service, she reported being sexually assaulted by the same individual on several occasions, becoming pregnant, and giving birth to a daughter.  (*Id*.)  She also detailed other prior traumas.  (*Id*.)  She reported a remote history of mental health treatment, as well as recent treatment with therapist Kim Jordan at the Vet Center for about two months.  (Tr. 716.)  She also described her current employment, since March 2021, as an entrepreneur implementing an online learning program with the Family First Life Center.  (Tr. 715-16.)  She spoke highly of her work and described "her passion for working with the children."  (Tr. 715.)  She stated that she was "interested and motivated to engage in treatment" and was "motivated to engage in services in order to 'be at my best for the children.'"  (Tr. 714-15.)

On examination, Ms. James was alert and responsive with good orientation and eye contact, normal speech, clear and appropriate thought content, and logical and goal oriented thought processes, but her affect was tearful, she appeared depressed, and her judgment and insight were fair.  (Tr. 716-17.)  Dr. Fedynich diagnosed other specified trauma- and stressor-

related disorder, noted Ms. James was "interested and appropriate for the COURAGE group," and informed Ms. James that she would be contacted prior to the start of the next module, likely in mid-February.  (Tr. 717.)  Dr. Fedynich also noted that Ms. James wanted to "remain active with her individual provider, Kim Jordan, at the Vet Center.  (*Id.*)  The end of this record, under the heading "Clinical Reminders Activity," the following language is included:

> RESOLUTION:
> Individual declined accepting information or resources.
> Individual declined accepting consult/referral.

(Tr. 718-19.)

Beginning on February 16, 2022, Ms. James attended weekly group psychotherapy sessions via video with the "Courage Group for women with MST," led by clinical psychologist Sara Kern; she completed and graduated from the program on May 17, 2022. (Tr. 698-713.)  Her treatment records for the group therapy program include the following observations:

- On February 15, 2022, she shared her "frustration at just now getting help after struggling for 40 years" and reported that MST had impacted her functioning, including her ability to hold a job. (Tr. 712-13.)  Her mood was apprehensive at check-in and "questionable" at check-out.  (*Id.*)

- On March 1, 2022, her mood was tense at check-in and sad at check-out.  (Tr. 712.)

- On March 9, 2022, in a session titled "Surviving Military Sexual Trauma," she discussed how she avoided friendships.  (Tr. 710-11.)

- On March 15, 2022, in a session titled "Coping with Strong Emotions," she shared that her emotions could be very strong or overwhelming due to PTSD.  (Tr. 709-10.)  Her mood was "okay" at check-in and hopeful at check-out.  (*Id.*)  She shared that she enjoyed the group and found it helpful.  (*Id.*)

- On March 22, 2022, in a session titled "Self-Blame," she shared an intent to harm her perpetrator[1] and highlighted how sexism in the military had contributed to her experience of MST.  (Tr. 708-09.)

---

[1] Other records indicate her perpetrator, a commanding officer, died during her period of military service. (Tr. 279.)

4

- On March 29, 2022, in a session titled "Grief and Loss," she discussed "career-related losses related to MST"; her mood at check-in was tense. (Tr. 707-08.)

- On April 5, 2022, in a session titled Anger," she shared that it had been "difficult for her to manage her anger since her trauma experience." (706-07.)

- On April 12, 2022, in a session titled "Trust," she shared "that she did not trust anyone to bring them on a desert island" and that she "struggles with trust due to betrayal." (Tr. 704-05.) Her mood at check in was relieved. (*Id.*)

- On April 19, 2022, in a session titled "Self-Esteem," she said her self-image had been negatively impacted by MST. (Tr. 703-04.) Her mood at check in was "okay." (*Id.*)

- On April 26, 2022, in a session titled "Relationships and Intimacy," she shared that "intimacy struggles ha[d] resulted in her leaving many relationships." (Tr. 702-03.) She reported "doing okay." (*Id.*)

- On May 3, 2022, in a session titled "Breaking the Silence," she shared "struggles she encountered related to disclosing her trauma. (Tr. 701-02.)

- On May 11, 2022, in a session titled "Self Forgiveness," she discussed her "difficulty forgiving herself" and her "journey with using substances to cope." (Tr. 699-701.)

- On May 17, 2022, at a final session titled "Moving Forward," her mood at check-in was "angry and I don't know why" and she was intermittently tearful during the discussion. (Tr. 698-99.) She also "shared tearful goodbyes and thank yous." (*Id.*)

On April 25, 2022, Ms. James attended a mental health diagnostic assessment with Sharon Johnson, LCDC, a clinical supervisor at Warren Family Recovery. (Tr. 502-21.) She was seeking mental health and addiction services, reporting that she felt like she was going to "go off" because her PTSD made her "suspicious of people's intentions." (Tr. 503, 511.) She reported that she was impregnated by her commanding officer while serving in the Air Force in the 1980s, explaining that he ridiculed her for going through with the pregnancy and abused her emotionally after the child was born because he disapproved of her pregnancy; he later died. (Tr. 503, 510.) She "admitted to diving deeper into substance and alcohol usage" after leaving the military, and put her daughter into her sister's care until 1992. (Tr. 503.) She sought residential addiction treatment in 1992, and reported no subsequent drug use other than marijuana. (Tr.

5

504.)  She married her current husband in the 1990s, and they had three children together.  (Tr.

503.)  In discussing her social history, she reported that "her husband and her church family are

her main sources of support and that they support her in every area of her life including her

vision to work w[ith] kids."  (Tr. 507; *see also* Tr. 520.)  But she also reported family conflict

with her oldest daughter, explaining that they did not have a good relationship and stating: "I'm

afraid my PTSD is going to make me go off on her."  (Tr. 507-08.)  Her mental status findings

were normal, including a happy mood, full affect, and cooperative behavior.  (Tr. 517-19.)

Recommended services included CPST, medication management, psychoeducation supportive

services, psychotherapy, substance use disorder services, and primary care.  (Tr. 519.)

She attended a primary care appointment with Constance Magoulias, M.D., on April 27,

2022 (Tr. 367-70), where she reported that she was "[w]orking with mental health, va and may

start meds" (Tr. 369).  She said she was going to the VA for "panic attacks/trouble sleeping"

following sexual abuse by a commanding officer.  (*Id.*)  On examination, she was alert and fully

oriented with normal behavior, thought content, and judgment.  (Tr. 369-70.)  At a May 8, 2022,

MetroHealth visit for cough, congestion, headache and diarrhea, she was again noted to be alert

and fully oriented with normal mood, behavior, thought content, and judgment.  (Tr. 360-64.)  A

primary care office visit note from Dr. Magoulias dated September 6, 2022 (Tr. 350-52), notes:

"On prozac va counsellor" and "Ptsd, depression, anxiety" (Tr. 351).

In January 2023, shortly after her December 2022 date last insured, the Warren Family

Recovery records indicate that a treatment plan was developed (Tr. 269-76) and Ms. James

began TBS services with LCDC Johnson (Tr. 268.)  She continued to attend mental health

treatment visits with LCSC Johnson thereafter.  (*See* Tr. 303-04, 586-92, 678-81, 733-34.)

At a February 1, 2023 physical therapy visit, Ms. James reported that she took care of her mother "quite a bit," worked in the church, and was independent with her activities of daily living with some pain and difficulty.  (Tr. 342.)  During a March 2023 emergency room visit for a respiratory infection, Ms. James said she was "working distributing food to the homeless" when she developed symptoms.  (Tr. 785.)  At a July 5, 2023 medical visit, she reported noticing memory issues over the last three months, which the doctor told her might be side effects of gabapentin and "psych meds."  (Tr. 781.)  Her mental status findings were normal.  (*Id*.)

At a psychiatry consultation in July 2023 (Tr. 586-92), Ms. James reported having taken fluoxetine (Prozac) for nearly a year without benefit before discontinuing the medication earlier that month (Tr. 586.  She reported "anger issues," and that she "was fired in the past when she was working with kids."  (*Id*.)  On examination, her mood was "okay," her attitude was "[c]alm, cooperative, engaged, pleasant on approach, guarded, hostile," and her affect was "neutral to tearful, stable, reactive."  (Tr. 588.)  At a psychological consultation in August 2023 (Tr. 595-99), she reported having to drop out of online college classes because of "difficulties focusing and concentrating," but said she was able to volunteer as a Platoon Leader for an organization that supports Veterans (Tr. 596).  She also reported resigning from a prior insurance job due to PTSD symptoms that made her fear that a "customer would come after her," and leaving a prior job working in daycare after being reprimanded when she "grabbed a child too firmly."  (*Id*.)

A rating decision from the VA dated August 3, 2023, contains a summary of records that were reviewed by that agency in deliberating on Ms. James's request for VA benefits (Tr. 546-49), including: "VA form 41-4192, received from Family First Child Care Center, documents that you were terminated from your employment due to absence and aggression" (Tr. 547).

7

At an individual therapy visit in October 2023 (Tr. 758-60), Ms. James reported that she was "working a couple of hours a day at her church's day care" and helping her daughter get her children ready and off to school in the mornings, but that this was tiring and she "continue[d] to have racing thoughts and difficulty concentrating and completing tasks" (Tr. 759). At a therapy visit in November 2023 (Tr. 754-56), she reported that she took care of her grandchildren every Saturday to Tuesday due to her daughter's work schedule, but also felt "overwhelmed" (Tr. 754). At a therapy visit in December 2023, Ms. James reported that she enjoyed having her grandchildren five days per week and enjoyed working at the daycare at her church, but noted "that she had been fired from there in the past for how she spoke to a staff member in anger," and that "her medication helps keep her more stable." (Tr. 733.)

### 2.        Opinion Evidence

On October 21, 2023, state agency psychological consultant Nicole Robicheau, Ph.D., found there was "insufficient medical and functional evidence prior to [the date last insured] to complete a medical assessment." (Tr. 64.) Dr. Robicheau noted that the April 25, 2022 mental status examination from a "Non-AMS"—meaning a medical provider who is not an acceptable medical source under Social Security regulations—"shows happy mood, full affect, cooperative, no cognitive impairment, estimated above average intellect." (*Id.*) She acknowledged that Ms. James was noted to be "intermittently tearful" at her May 18, 2022 "VA therapy group." (*Id.*)

## C.        Hearing Testimony

### 1.        Plaintiff's Testimony

At the April 1, 2024 hearing, Ms. James testified that she filed for disability because she "can't remember things anymore," and because she had long felt like "a target….[t]o get fired or be let go sort of." (Tr. 41.) When working at one job, she felt like a supervisor "was after her,"

her numbers were always off, and she was being "sabotaged." (*Id.*) After leaving that job, she stayed home for four years because she "sort of had a little breakdown." (*Id.*) Then, when she returned to work in 2018, she experienced memory problems, "couldn't concentrate on activities," and got angry and overwhelmed. (Tr. 42-44.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. (Tr. 47-49.) The VE classified Ms. James's past relevant work as: financial services representative, billing typist, collection clerk, credit clerk, policy holder information clerk, and sales agent insurance. (Tr. 47-48.) The VE also testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination (Tr. 22), could perform all of Plaintiff's past relevant work except for: sales agent insurance (Tr. 48-49). If the same individual also had to avoid jobs that require persuasion and directing the work of others, the VE testified that the individual could perform all of Plaintiff's past relevant work except for: financial services representative and sales agent insurance. (*Id.*)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520, § 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

### IV.     The ALJ's Decision

In her April 25, 2024 decision, the ALJ made the following findings:[3]

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.  (Tr. 19.)

2.     The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 30, 2021 through her date last insured of December 31, 2022.  (*Id*.)

3.     The claimant had the following severe impairments: neuropathy, osteoarthritis in the left knee, and minimal degenerative joint disease spurring in the right knee.  (*Id*.)

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 21.)

5.     The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). In addition, the claimant could stand/walk for 4 hours in an 8-hour workday. The claimant could frequently push/pull with the bilateral lower extremities. The claimant could never climb ladders/ropes/scaffolds; could occasionally climb ramps and stairs; could occasionally balance, kneel, crouch, and crawl; and could frequently stoop. The claimant could nave no work that required frequent exposure to extreme cold, heat, wetness, humidity, and vibration; and could not have exposure to hazards such as work in unprotected heights, heavy machinery such as power saws and jack hammers, and the claimant could perform no commercial driving.  (Tr. 22-25.)

6.     Through the date last insured, the claimant was capable of performing past relevant work as a financial services representative, billing typist, collection clerk, credit clerk, policy holder information clerk, and an insurance sales agent. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity. (Tr. 25.)

Based on the foregoing, the ALJ found Ms. James was not under a disability from June 30, 2021, through December 31, 2022, the date last insured.  (Tr. 26.)

---

[3] The ALJ's findings are summarized.

## V.  Plaintiff's Argument

In her sole assignment of error, Ms. James argues that the ALJ erred when she failed to find Plaintiff's mental impairments "severe" at Step Two and when she failed to include mental limitations in the RFC determination at Step Four.  (ECF Doc. 9, pp. 1, 9-17; ECF Doc. 15.)

## VI.  Law & Analysis

### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    Sole Assignment of Error: The ALJ's Findings Regarding Plaintiff's Mental Impairments at Steps Two and Four Were Not Supported by Substantial Evidence**

In her sole assignment of error, Ms. James argues that the ALJ erred in finding her mental impairments non-severe at Step Two because the ALJ's analysis "completely mischaracterizes the evidence." (ECF Doc. 9, pp. 10-15.) Further, she asserts that the ALJ's failure to find the impairments severe was harmful error because it is not clear that the ALJ considered the mental impairments in formulating the RFC at Step Four. (*Id.* at pp. 15-16.) Since "all of Plaintiff's past relevant work has a reasoning level of 3 or above," Plaintiff argues that the ALJ's failure to include mental limitations in the RFC warrants remand. (*Id.* at p. 16.) The Commissioner asserts in response that the ALJ's findings at Steps Two and Four were supported by substantial

13

evidence, and that Plaintiff's argument that the ALJ mischaracterized the evidence is merely an invitation for this Court to improperly reweigh the evidence.  (ECF Doc. 11, pp. 7-14.)

1.      **Legal Standard for Step Two Determinations**

A claimant bears the burden of showing the severity of her impairments.  *Foster v. Sec'y of Health & Hum. Servs.,* 899 F.2d 1221, at *2 (6th Cir. 1990) (unpublished table decision) (citing *Murphy v. Sec'y of Health & Human Servs.*, 801 F.2d 182, 185 (6th Cir. 1986)).  A "severe" impairment is defined under the regulations as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities."  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520(c)); *see also Long v. Apfel*, 1 F. App'x 326, 330-32 (6th Cir. 2001).

In evaluating a mental impairment, an ALJ must rate the claimant's degree of functional limitation in four broad areas of mental functioning using a five-point scale including: none, mild, moderate, marked, and extreme.  20 C.F.R. § 404.1520a(c), (e)(4).  The four broad areas of mental functioning are: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself.  20 C.F.R. § 404.1520a(c)(4).  "The four broad functional areas are also commonly referred to as the 'paragraph B' criteria."  *Avers v. Kijakazi*, No. 3:20-CV-01433, 2021 WL 4291228, at *9 (N.D. Ohio Sept. 21, 2021) (citation omitted).  If a claimant's degree of limitation is rated "as 'none' or 'mild,'" the conclusion will generally be that a claimant's "impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities."  20 C.F.R. § 404.1520a(d)(1).

The Sixth Circuit has construed Step Two as a de minimis hurdle, explaining that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects

work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  "The goal of the test is to 'screen out totally groundless claims.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (*quoting Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985)).  Although the standard is de minimis, it is recognized that a diagnosis alone "says nothing about the severity of the condition."  *Higgs*, 880 F.2d at 863; *see also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of those impairments, however, does not establish that [claimant] was significantly limited from performing basic work activities for a continuous period of time.").

In *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240 (6th Cir. 1987), the Sixth Circuit held that it is not reversible error for the Commissioner to deem an impairment "non-severe" in a case where other impairments have been found "severe," since the Commissioner could properly consider non-severe impairments in assessing the RFC.  *See id.* at 244; *see also Anthony*, 266 F. App'x at 457 (finding it "legally irrelevant" that some impairments were not deemed severe because the ALJ could consider "severe and non-severe impairments in the remaining steps of the sequential analysis"); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) (finding "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence" when ALJ found a severe impairment).  Conversely, a failure to consider a non-severe impairment in assessing the RFC has been found to be reversible error.  *See Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 190-191 (6th Cir. 2009) (distinguishing *Maziarz* and finding reversible error when an ALJ found a non-severe mental impairment "would not be considered in assessing her RFC"); *cf. Pompa,* 73 F. App'x at 803 (finding harmless error where the "ALJ considered all of [plaintiff]'s impairments in her residual functional capacity assessment").

15

More recently, in *Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000 (6th Cir. 2025), the Sixth Circuit considered a challenge to an ALJ's Step Two findings without applying a harmless error analysis. Instead, the *Napier* court applied a substantial evidence analysis in assessing whether the ALJ erred in finding mental impairments non-severe at Step Two, or by failing to incorporate mental limitations into the RFC at Step Four. *Id.*

### 2. The ALJ's Findings Regarding Plaintiff's Mental Impairments at Steps Two and Four Were Not Supported by Substantial Evidence

In support of her finding that Ms. James had no more than mild limitations in the functional area of "concentrating, persisting or maintaining pace," the ALJ explained:

> The claimant testified that she has problems with concentration. However, during a February 2022 mental health intake, the claimant stated that she currently works part-time as an entrepreneur for the City of Cleveland with Family First Life Center (Exhibit 4F/32). A mental status evaluation noted that the claimant was tearful but otherwise was oriented, had normal speech, and had coherent thought process, and had fair insight and judgment. The claimant declined referrals for mental health treatment (Exhibit 4F/34). She had another mental health diagnostic assessment in April 2022 where she alleged problems with concentration and making decisions (Exhibit 1F/25). However, a mental status evaluation noted that the claimant had a happy mood, was cooperative, and had logical thought process (Exhibit 1F/28). Treatment notes after the date last insured indicate that the claimant was working distributing food to the homeless (Exhibit 12F/17). Findings of intact cognitive functioning and evidence that she was able to perform work with the Family First Life Center and other volunteer activities indicate mild limitation in concentrating, persisting, or maintaining pace.

(Tr. 20-21 (emphasis added).) In arguing that the ALJ's analysis mischaracterizes the evidence, Ms. James notes that "[w]e have indications . . . that Plaintiff was fired working with children, and the ALJ cannot point to the extent of any work Plaintiff may have performed." (ECF Doc. 9, p. 13.) In response, the Commissioner merely restates the ALJ's findings with respect to this functional area (ECF Doc. 11, pp. 9-10) and asserts that Plaintiff's argument amounts to a request for the Court to reweigh the evidence (*id.* at p. 13).

16

While the substantial evidence standard is deferential, the Sixth Circuit has emphasized that the chief limitation to that deference "is the requirement that all determinations be made based upon the record in its entirety." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007) (citing *Houston v. Sec'y of Health & Hum. Servs.*, 736 F.2d 365, 366 (6th Cir. 1984)). "This requirement that determinations be made in light of the record as a whole helps to ensure that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history[.]" *Id.*; *see also* 20 C.F.R. § 404.1520(e) (findings regarding RFCs will be "based on all the relevant medical and other evidence" in the case record).

An ALJ need not "discuss each piece of data in [his] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)). But she must perform "a proper analysis of the medical evidence under agency regulations and controlling case law," and may not "cherry-pick[] select portions of the medical record" to support her findings. *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013); *see also Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where ALJ was "selective in parsing the various medical reports"). In other words, an ALJ cannot simply "pick and choose" evidence in the record, "relying on some and ignoring others, without offering some rationale for h[er] decision." *Young v. Comm'r of Soc. Sec.*, 351 F. Supp. 2d 644, 649 (E.D. Mich. 2004).

Instead, the ALJ's explanation must "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877; *see id.* at 881 ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if

accepted, would change his analysis.") (citations omitted).  And an explanation premised on a mischaracterization may deprive the analysis of the support of substantial evidence.  *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 191 (6th Cir. 2009) (finding ALJ decision lacked the support of substantial evidence where the decision was premised on "a clear mischaracterization of the facts"); *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787-88 (6th Cir. 2009) (finding ALJ lacked substantial evidence to support RFC after mischaracterizing evidence).

Focusing first on the ALJ's reliance on Plaintiff's reported part-time work with the Family First Life Center as evidence that she had no more than mild limitations in concentrating, persisting, and maintaining pace, a review of the complete evidentiary record shows:

- Plaintiff reported in January 2022 that she had been employed as an entrepreneur implementing an online learning program with the Family First Life Center since March 2021, and that she was motivated to engage in mental health treatment in order to "be at [her] best for the children."  (Tr. 714-16.)

- She sought mental health treatment in April 2022 because she felt her PTSD was going to make her "go off" on others, including her daughter.  (Tr. 508, 511.)

- In July 2023, she reported "anger issues" and that she "was fired in the past when she was working with kids."  (Tr. 586.)

- In August 2023, she reported having left a prior job working in a daycare after she was reprimanded when she "grabbed a child too firmly."  (Tr. 596.)

- A VA rating decision from August 2023 described a form "received from Family First Child Care Center" which indicated that Plaintiff was "terminated from [her] employment due to absence and aggression."  (Tr. 547.)

- In December 2023, Ms. James reported that she had been fired from her church daycare in the past "for how she spoke to a staff member in anger," but that "her medication help[ed] keep her more stable."  (Tr. 733.)

When the ALJ relied on Plaintiff's ability to perform work at the Family First Life Center as evidence of her mild limitations in concentrating, persisting, and maintaining pace, she failed to acknowledge or address various general references to Plaintiff's angry or inappropriate actions in jobs where she worked with children, which reportedly led to reprimand or termination, or one

18

specific record indicating the Family First Life Center in particular had reported to the VA that Plaintiff was terminated from that job "due to absence and aggression."  (Tr. 547.)  The undersigned concludes that the ALJ's reliance on Plaintiff's reported engagement in work activities—without acknowledging specific mental health symptoms that reportedly led to her termination from that job and others like it—effectively mischaracterized the evidentiary record.

The undersigned also has concerns relating to the ALJ's reliance on a finding that Ms. James "declined referrals for mental health treatment" as evidence of her mild limitations in concentrating, persisting, and maintaining pace.  (*See* Tr. 21 (citing Tr. 492).)  While it is technically true that the referenced assessment states at its conclusion that the "[i]ndividual declined accepting consult/referral" (Tr. 492, dup. 719), a review of the complete record for the January 2022 intake assessment reveals that:

- The initial assessment was scheduled in direct response to Plaintiff's request for a referral for mental health services, specifically MST programming, at the recommendation of her therapist Kim Jordan (Tr. 719);

- Upon completing the assessment, clinical psychologist Fedynich concluded that Plaintiff was "interested and appropriate for the COURAGE group," noted that she wanted to remain active with her existing provider Kim Jordan, and informed Plaintiff that she would be contacted before the start of the next module (Tr. 717); and

- Treatment records indicate that Plaintiff participated in the Courage therapy group as scheduled, regularly attended sessions, was often described as "fully engaged," and graduated from the program in May 2022 (Tr. 698-713).

Thus, the ALJ did not accurately characterize the records for the January 2022 intake assessment when she wrote that Plaintiff "declined referrals for mental health treatment."  (Tr. 21.)  On the contrary, the assessment cited by the ALJ was the specific vehicle through which Ms. James *received* a referral for requested mental health treatment, which she went on to complete as scheduled.  The notation that Ms. James "declined consult/referral" (Tr. 718-19) appears to be an either an inaccurate notation or a response to Ms. James's statement that she "would like to

19

remain active with her individual provider, Kim Jordan" (Tr. 717).  The undersigned therefore concludes that the ALJ's finding that Plaintiff "declined referrals for mental health treatment"— based on record that shows Plaintiff both requested a referral for mental health treatment and completed that treatment as scheduled—effectively mischaracterized the evidentiary record.

Thus, the ALJ based her finding of mild limitations in concentration, persistence, and maintaining pace in part on: (1) evidence of work activity, without addressing records suggesting Plaintiff's mental health symptoms led to her termination from that job and similar work; and (2) Plaintiff's decision to decline a treatment referral, where the cited record actually shows that Plaintiff requested, received, and followed through with a mental health treatment referral. Because it is unclear whether or how the ALJ factored the missing and/or mischaracterized evidence into her findings at Step Two of the sequential analysis, it is also unclear whether or how the ALJ weighed the same evidence in developing the RFC at Step Four.  Therefore, the undersigned concludes that the ALJ inadequately articulated her Step Two and Four analyses, failed to support her analyses with substantial evidence, and failed to build "an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F. Supp. 2d at 877.

For the reasons set forth above, the undersigned concludes that the ALJ's written decision does not show that she considered the entire record and adequately articulated the bases for her Step Two and Four findings.  Accordingly, the undersigned finds that Plaintiff's sole assignment of error has merit and recommends that the Court vacate and remand ALJ's decision for further proceedings consistent with this Report and Recommendation.

## VII.    Recommendation

For the reasons set forth above, the undersigned recommends that the final decision of the Commissioner be **VACATED** and **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four,

for further proceedings consistent with this Order.  On remand, the ALJ should: consider the entire record; accurately discuss the evidence; clearly articulate the rationale for her Step Two and Four findings with regard to Plaintiff's mental impairments; and ensure that her stated rationale builds an accurate and logical bridge between the evidence and the result.

January 26, 2026

*/s/Amanda M. Knapp*

AMANDA M. KNAPP
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).